# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## MAY 1999 SESSION

FILED

August 10, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 03C01-9805-CR-00184 |
| | ) | |
| vs. | ) | Knox County |
| | ) | |
| ANDREW LEE MOATS, JR., A.K.A, | ) | Hon. Ray L. Jenkins, Judge |
| BUTCH MOATS | ) | |
| | ) | |
| Appellant. | ) | (First Degree Murder) |

FOR THE APPELLANT:

**M. JEFFREY WHITT (at trial and**
Attorney at Law        **on appeal)**
706 Walnut Street, Suite 902
Knoxville, TN 37902

**RICHARD W. CLARK, III (at trial)**
Attorney at Law
706 Walnut Street, Suite 903
Knoxville, TN 37902

FOR THE APPELLEE:

**PAUL G. SUMMERS**
Attorney General & Reporter

**MARVIN S. BLAIR, JR.**
Assistant Attorney General
425 Fifth Ave. N., 2d Floor
Nashville, TN  37243-0493

**WILLIAM E. DOSSETT**
District Attorney General

**FRED BRIGHT**
Assistant District Attorney General
400 Main, P.O. Box 1468
Knoxville, TN 37901-1468

OPINION FILED:_____

**AFFIRMED**

**JAMES CURWOOD WITT, JR., JUDGE**

The defendant, Andrew Lee Moats, Jr., appeals from his jury conviction for first degree murder[1] in the Knox County Criminal Court. The trial court imposed a life sentence in the Tennessee Department of Correction. In this direct appeal, the defendant challenges the sufficiency of the evidence and contends there is inadequate proof of intent, deliberation and premeditation to support his conviction for first degree murder. After a review of the record, the briefs of the parties, and the applicable law, we affirm.

The state presented the following proof. Jeffery Mayes testified that he met the victim, Dallas Walker, at the victim's home two days prior to the victim's murder. Mayes received over five hundred dollars from the victim to purchase marijuana for the victim and Carl Neer. Mayes gave the defendant the money to purchase the marijuana. The defendant and Mayes attempted to obtain the marijuana, but they were unsuccessful.

Richard Breeden testified that the day before the victim's murder, June 8, 1990, he talked to the victim about the victim's deal with the defendant. Breeden had recently traded his Jeep and an Intratec nine millimeter automatic pistol for the defendant's Lincoln Continental. Around dusk that evening, Breeden, the victim, Marlene Walker, Chuck Walker and Bill Cox went to the defendant's house in Breeden's Lincoln. The victim, the defendant and Mayes talked outside in front of the defendant's home. Breeden was unable to hear this conversation, but he testified that it was a very brief conversation and he saw no violent gestures. After this conversation, the five of them drove to Maynardville in search of the defendant's

---

[1] Tenn. Code Ann. § 39-13-202(a)(1) (1990).

Jeep. Four hundred dollars was still owed on the Lincoln for which Breeden traded the Jeep; therefore, Breeden was unable to obtain a clear title to the Lincoln. They did not locate the defendant's Jeep, and they returned to Marlene Walker's home.

Breeden testified that the following morning, the victim and Carl Neer came to his house in the victim's creme-colored Ford Escort. The victim drove Neer and Breeden to the defendant's home to inquire about his money, but the defendant was not at home. In the afternoon, Mayes called Breeden and told him that they had half the victim's money, and they would obtain the other half by the end of the day. Mayes testified he told Breeden that the defendant had all the victim's money. Breeden notified the victim of the situation. The victim returned to Breeden's house with Carl Neer, and they drove to the defendant's home again. The victim parked his car at a Mrs. Winner's restaurant near the defendant's home. Mayes exited the defendant's home where he met Breeden near the street. Mayes told Breeden, who was carrying a .25-caliber gun, it would take another 30-45 minutes to obtain the victim's money. The victim and Breeden left, but Breeden returned to the defendant's house later to inquire about the victim's money. Mayes testified that he saw a nine millimeter gun laying in the passenger's seat of Breeden's Lincoln while he and Breeden were talking. Breeden testified that Mayes seemed very nervous during this meeting.

In addition to the meetings for which Breeden testified, Mayes testified about a meeting in Marlene Walker's driveway among Mayes, the victim and the defendant, which occurred on the night before or the day of the victim's murder. The victim asked Mayes about his money, and Mayes told the victim that the defendant had the money. The victim and the defendant discussed something calmly, but Mayes was unable to hear the conversation.

3

Carl Neer testified that he arrived at the victim's house around 8:30 p.m. on the evening of the murder. Neer testified that he was not there in the morning as Breeden had testified. Neer testified that he, the victim and Marlene Walker drove to Breeden's house in the victim's Ford Escort. The four of them went to the defendant's house, Breeden knocked on the door, and Breeden returned to the car saying no one was there. They parked across the street from the defendant's house at a fast food restaurant. Neer described the meeting of Breeden and Mayes consistently with the testimony of Breeden and Mayes. The victim returned Breeden to his home and drove Marlene Walker and Neer to the victim's home.

Marlene Walker left the victim's home, but returned ten to fifteen minutes later. Walker told the victim that the defendant had returned home and suggested that the victim should go to the defendant's to retrieve his money. The victim and Neer drove to the defendant's home around 11:00 p.m. on June 9, 1990. Because the victim did not see the defendant's Jeep at the defendant's home, he decided to park in a parking lot near the defendant's home to watch and wait for the defendant. Neer testified that within five minutes a person exited the front door of the defendant's home. One to two minutes later, two more people exited the defendant's home. Neer saw a Jeep exit the defendant's home on a side street. The Jeep pulled in front of their car at an angle with the bright lights shining into the victim's car. The bright lights remained on the victim and Neer as they lifted their hands to cover their eyes. After ten to twelve seconds, the Jeep pulled door-to-door to the victim's car. According to Neer, the defendant, the driver in the Jeep, said the victim's name and asked the victim if the victim had been looking for him. Neer did not hear the victim say anything. The defendant had a shotgun placed across his lap. The victim and Neer did not have guns in their hands at this time, but there were two guns in the car which were visible. Neer testified that the defendant shot

4

the victim in the face within seconds or minutes of placing his Jeep door-to-door with the victim's car. After bringing himself off the floorboard, Neer exited the vehicle with the .25-caliber gun and attempted to shoot at the Jeep. The gun would not discharge, and Neer threw it in a nearby yard.

Mayes was with the defendant when the victim was shot. Mayes testified that the defendant never talked about shooting someone that night. At first, Mayes testified that he saw the defendant put the shotgun in the Jeep a few minutes prior to the victim's shooting at the defendant's house. Mayes testified that the victim said something to the defendant before the defendant shot him, but Mayes could not hear the conversation. Upon cross examination, Mayes testified that the shotgun was already in the Jeep when he, the defendant and the defendant's girlfriend entered the Jeep. Additionally, Mayes confirmed his testimony in a prior proceeding that the defendant kept the shotgun in his Jeep most of the time. Mayes did not see the victim with a gun, but the defendant said the victim had a gun. Mayes's view into the victim's car was partially blocked by the defendant because Mayes was in the back seat of the Jeep. After shooting the victim, the defendant quickly drove away from the scene. The defendant or his girlfriend threw the shotgun out of the Jeep. The defendant drove himself, his girlfriend and Mayes into Kentucky, but they returned a couple of days later.

The defendant presented no proof. After hearing this evidence, the jury found the defendant guilty of first degree murder.

The defendant contends the evidence is insufficient to support his conviction. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

5

essential elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); <u>State v. Duncan</u>, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. <u>State v. Dykes</u>, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. <u>State v. Matthews</u>, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. <u>Liakas v. State</u>, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); <u>Farmer v. State</u>, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. <u>Cabbage</u>, 571 S.W.2d at 835.

The statute governing this offense defined first degree murder as "an intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1990) (amended 1995). "'Intentional' refers to a person who acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1990). The statutory definition of a deliberate act is one performed with a cool purpose, while a premeditated act occurs after reflection and judgment. <u>See</u> Tenn. Code Ann. § 39-13-201(b)(1)-(2) (1990) (amended 1995). Additionally, premeditation has been described as "a previously formed design or intent to kill."

State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted). Our supreme court distinguished intent and premeditation from deliberation by saying "even if intent . . . and premeditation . . . may be formed in an instant, deliberation requires some period of reflection, during which the mind is 'free from the influence of excitement, or passion.'" State v. Brown, 836 S.W.2d 530, 540 (Tenn. 1992) (quoting Clarke v. State, 402 S.W.2d 863, 868 (Tenn. 1966)).

In State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992), our supreme court stated, "The law in Tennessee has long recognized that once the homicide has been established, it is presumed to be murder in the second degree." In this case, the state must prove the elements of intent, premeditation and deliberation beyond a reasonable doubt before a murder is elevated to murder in the first degree. Brown, 836 S.W.2d at 543 (citing Bailey v. State, 479 S.W.2d 829, 833 (Tenn. Crim. App. 1972)). A jury may infer the elements of premeditation and deliberation from the circumstances surrounding the killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). However, there must be some evidence adduced at trial from which the jury may infer premeditation and deliberation. See State v. West, 844 S.W.2d 144, 148 (Tenn. 1992). Facts from which a jury could infer premeditation and deliberation are use of a deadly weapon upon an unarmed victim, procurement of a weapon prior to the killing, declarations of an intent to kill, preparations made prior to the killing for the murder itself or concealment of the murder, and the relationship between the defendant and the victim from which a motive may be inferred. See id. at 4-5; Brown, 836 S.W.2d at 541-42 (citations omitted).

The defendant's theory at trial was that he shot the victim in self-defense. The jury rejected the defendant's theory that he acted in self-defense. A finding that the defendant did not act in self-defense does not equate to a finding

7

of premeditation and deliberation. See State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).

Viewed in the light most favorable to the state, the evidence shows the victim and the defendant were involved in a drug deal. The victim gave the defendant over five hundred dollars, but never received any drugs nor was his money returned. The victim attempted numerous times to contact the defendant over a two-day period prior to his murder. At one point, the victim and the defendant talked, but there was no testimony regarding what was said during this conversation. However, it is clear that the defendant knew the victim was attempting to contact him during this period of time. Neer testified that the victim felt "ripped off" by the defendant when he had not received drugs or his money. Breeden, Neer and Mayes testified regarding all the firearms involved in the various meetings. Neer testified that during the encounter with the defendant, there were two guns in the victim's car. Mayes testified that the defendant had a shotgun across his lap when he was talking to the victim.

When the defendant approached the victim's car, he first parked directly facing the car with his bright lights shining on the victim and Neer for ten to twelve seconds. This time interval gave the defendant adequate time to decide what action he wanted to take next. He pulled his Jeep door-to-door with the victim's car so that he and the victim were in close proximity and conversed with the victim while holding a shotgun across his lap. Without any evidence of provocation or threatening conduct by the victim, the defendant shot the victim in the face at near point blank range.

From the evidence introduced at trial, a rational jury could find that the defendant intentionally shot the victim from the evidence introduced at trial. See

8

West, 844 S.W.2d at 148. Additionally, these facts create an inference that the defendant reflected upon the course of action he would take with a clear head. There was a shotgun laying across the defendant's lap when he placed his Jeep door-to-door with the victim's car. Obviously, the defendant prepared for a confrontation with the victim during the ten to twelve second interval when the Jeep's bright lights were shining on the victim and Neer. The defendant's Jeep was taller than the victim's car which gave the defendant a tactical advantage. From his higher viewpoint, the defendant quickly lifted his shotgun and shot the victim in the face. Accordingly, a rational jury could find the defendant formed a design to kill and deliberately shot the victim.

In analyzing the sufficiency of the proof of deliberation and premeditation, we have examined a number of Tennessee cases, including State v. Donald Wallace, No. 01C01-9711-CC-00526 (Tenn. Crim. App., Nashville, Sept. 30, 1998) (no application for perm. app. filed). In Donald Wallace, this court reversed Wallace's first degree murder conviction because the state failed to establish that the killing of the victim was premeditated. Wallace and the victim, his girlfriend, appeared to be enjoying an amiable relationship when they were with friends earlier in the day; however, later, the defendant, accompanied by the victim, erratically drove his vehicle into a commercial parking lot and "proceeded to slap the victim in the face and then shoot her in the presence of numerous witnesses." Donald Wallace, slip op. at 10. This court said that the conduct was "not indicative of the 'exercise of reflection and judgment.'" Id. The court noted that there was an "absence of motive [and] . . . planning activity." Id., slip op. at 11.

On the other hand, in the present case, the state offered proof of motive and that the defendant planned for the shooting by placing the shotgun across his lap before maneuvering his vehicle to a position where he and the victim

9

were in close proximity. Significantly, the defendant stopped his vehicle and shined his headlights onto the victim for several seconds before pulling alongside the victim's car. Based upon all the circumstances, the record reveals evidence which supports the jury's inference that the elements of first degree murder were present beyond a reasonable doubt.

Based upon the fact that one of the two pistols which were laying on the floorboard hump prior to the shooting was found in the floor beneath the victim's body, the defendant argues that the victim had grabbed the weapon and that this circumstance supports his theory of self-defense. Quite possibly it does, but the jury has declined to attach any significance to this equivocal physical fact of the gun's discovered position, and no one testified that the victim reached for or used the weapon. As pointed out above, the appellate court may not reweigh nor reevaluate the evidence. Factual issues are resolved by the trier of fact. Cabbage, 571 S.W.2d at 835. Furthermore, we may not substitute any inference which we may draw about the final position of the pistol for the inferences drawn by the jury. Farmer, 574 S.W.2d at 51.

Based upon the foregoing reasons, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

CONCUR:

10

_____
JOHN EVERETT WILLIAMS, JUDGE


_____
ALAN E. GLENN, JUDGE